RHEEM MANUFACTURING
COMPANY, Appellant–
Defendant,

v.

PHELPS HEATING & AIR
CONDITIONING, INC.,
Appellee–Plaintiff.

No. 49A02–9807–CV–620.

Court of Appeals of Indiana.

Aug. 12, 1999.

Rehearing Denied Oct. 28, 1999.

Stephen L. Vaughan, Thomas J. Campbell, Robert W. Wright, Locke Reynolds Boyd & Weisell, Indianapolis, Indiana, Attorneys for Appellant.

Robert A. Garelick, Bryan S. Redding, Cohen, Garelick & Glazier, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BROOK, Judge

### Case Summary

Appellant-defendant Rheem Manufacturing Company ("Rheem") appeals from the trial court's partial denial of its motion for summary judgment. Specifically, Rheem appeals the trial court's determination that there are genuine issues of material fact as to whether an exclusive remedy in the sales contract between Rheem and appellee-plaintiff Phelps Heating and Cooling, Inc. ("Phelps") failed of its essential purpose; as to whether a third party, Federated Supply Corp. ("Federated"), acted as an agent of Rheem; and as to whether implied warranties may have arisen from the course of dealing between Rheem and Phelps or from the usage of trade. We affirm and remand for further proceedings.

### Issues

The parties raise several issues in this interlocutory appeal. We consolidate the issues and restate them as the following four issues:

(1) whether, in the context of a limited remedy which has arguably failed of its essential purpose, IND.CODE § 26–1–2–719(2) ("subsection (2)") and IND. CODE § 26–1–2–719(3) ("subsection (3)") are to be read "independently" of one another, as the majority of U.S. jurisdictions hold, or "interdependently," according to the minority view.

(2) whether, regardless of the construction and interpretation of subsection (2) and subsection (3), Phelps is entitled to a trial on the issue of consequential and incidental damages arising from a putative breach of warranty by Rheem;

(3) whether the trial court erred in denying Rheem's motion for summary judgment on the issue of whether Federated acted as an agent of Rheem; and

(4) whether the trial court erred in denying Rheem's motion for summary judgment on the issue of whether implied warranties may have arisen between Rheem and Phelps by either course of dealing or usage of trade.

### Facts and Procedural History

This is a commercial dispute regarding the sale of residential gas furnaces. Rheem manufactures gas furnaces and other heating and air conditioning equipment. Phelps, a central Indiana heating and air conditioning contractor, purchased Rheem equipment through Federated, an authorized distributor

of Rheem products, for resale and installation to home builders or individual home owners. Phelps began purchasing the furnaces at issue from Federated in the late 1980's.[1] The distributor agreement between Rheem and Federated provided that Federated was an independent contractor and that the relationship of principal and agent was not created between Rheem and Federated.

All Rheem gas furnaces were accompanied by a written limited warranty containing the following provisions: a "quality commitment" provision,[2] a limited remedy provision, a service labor exclusion, and a consequential and incidental damages exclusion. The purpose of the "quality commitment" provision was to warrant parts against failure under normal use within a specified time period. The "quality commitment" provision, an express warranty, read in pertinent part:

> MANUFACTURER AND RHEEM AIR CONDITIONING DIVISION warrant ANY PART of this furnace against failure under normal use and service within the applicable periods specified below, in accordance with the terms of this warranty.

The warranty periods varied with the model of furnace and/or with the components.

The limited remedy provision addressed replacement parts only:

> Under this Warranty, RHEEM will furnish a replacement part that will be warranted for only the unexpired portion of the original warranty; if a heat exchanger fails and a replacement is not available, a credit will be allowed for the cost of the heat exchanger toward the purchase price of a new furnace as described below.

The consequential and incidental damages exclusion read as follows:

> RHEEM'S SOLE LIABILITY WITH RESPECT TO DEFECTIVE PARTS

> SHALL BE AS SET FORTH IN THIS WARRANTY, AND ANY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARE EXPRESSLY EXCLUDED.

Finally, the limited warranty contained a service labor exclusion. Rheem's brief characterizes this exclusion as "stating that [service labor] expenses are the responsibility of the home owner, unless a service labor agreement exists between the home owner and contractors such as [Phelps]." The exclusion read:

> SERVICE LABOR RESPONSIBILITY: This Warranty does not cover any labor expenses for service, nor for removing or reinstalling parts. All such expenses are your responsibility unless a service labor agreement exists between you and your contractor.

Different models of Rheem furnaces carried different "annual fuel utilization efficiency" (AFUE) ratings. The higher the AFUE rating, the higher the efficiency. The record indicates that Rheem has manufactured furnaces with 60%, 70%, 78%, 80%, and 90% efficiency ratings. In late 1989, Phelps' customers began having problems with Rheem furnaces, particularly with the 80% and 90% efficiency models, and these problems continued for approximately the next four years.

Rheem periodically issued to its distributors "technical service bulletins" regarding the servicing of its products, and containing product or component updates, field testing and trouble shooting, and extended warranties, and special labor allowances for contractors. Between January 1991 and May 1994, Rheem issued at least eleven such service bulletins. Phelps submitted evidence to the trial court that during the period from late

---

1. The record reflects that Rheem and Federated entered in to a "Distributor Agreement" on or about June 23, 1987. The record is not clear as to the date of Phelps' last purchase from Federated.

2. "Although it is frequently difficult to appreciate the distinction between warranty disclaimers or modifications and limitations of remedy, these two devices in theory constitute two separate mechanisms for eliminating responsibility for product quality. A disclaimer or modification of

warranty eliminates the quality commitment. It limits the circumstances in which the seller or manufacturer may be deemed to be in breach of warranty. A limitation of remedy, on the other hand, acknowledges the quality commitment but restricts the remedy available once a breach has been established." *Hahn v. Ford Motor Co., Inc.*, 434 N.E.2d 943, 952–53 (Ind.Ct.App.1982), citing *Gladden v. Cadillac Motor Car Division*, 83 N.J. 320, 416 A.2d 394 (1980).

1989 to mid–1993, it was not uncommon to have a customer visited four times by a Phelps' service representative trying to remedy the defects in Rheem furnaces.

Federated, for its part, had issued service labor "credits" as part of its own warranty program. The record indicates that through April, 1994, Federated had issued $13,715 worth of such credits to Phelps. On May 11, 1994, Phelps requested a meeting with a Rheem field representative, asserting that excessive warranty claims from Phelps' customers were causing Phelps financial hardship. A Rheem representative met with Phelps, at which time Phelps requested $40,-575.52 to $65,951.16[3] in compensation for service labor for service calls to Phelps customers. Rheem responded that all service labor credits allowed by Rheem had already been issued by Federated (and thus, no further remedy would be available under the terms of the limited remedy provision relating to the furnaces).

On August 8, 1994, Phelps filed suit against Rheem and Federated, claiming that the Rheem furnaces shut down and that parts such as pilot assemblies, hot surface igniters, flame sensors and ignition controls failed. Additionally, Phelps contended that the 90% drum furnace heat exchangers often cracked. The theories underlying Phelps' original action were negligence, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.

On September 5, 1997, Rheem filed a motion for summary judgment, with a supporting brief and a designation and submission of evidence. The summary judgment theories pertinent to this appeal are that the damages sought by Phelps were excluded by the service labor exclusion, consequential damages exclusion, and incidental damage exclusion of Rheem's written limited warranties. Rheem also asserted lack of privity between the parties as additional grounds for summary judgment on Phelps' implied warranty claims.[4]

On June 18, 1998, the trial court entered the following order on Rheem's motion for summary judgment:

This matter, having come before the Court on the Motion for Summary Judgment, filed by the Defendant, Rheem Manufacturing Company with regard to the claims of Plaintiff, Phelps Heating & Air Conditioning, Inc., and the Court having held a hearing on said motion on May 14, 1998, and having considered the arguments of counsel, and those matters designated by the parties pursuant to Ind. Trial Rule 56(C), the Court NOW FINDS as follows:

1. There are no genuine issues as to any material facts with regard to the following:

a. The Defendant, [Rheem], manufactured furnaces which were distributed by Defendant, [Federated] and sold to Plaintiff, [Phelps].

b. Each of the furnaces manufactured by Defendant, [Rheem], [is] accompanied with a limited parts replacement warranty, created by Defendant, [Rheem].

c. Problems occurred with certain component parts of the furnaces manufactured by Defendant, [Rheem].

d. Defendant, [Rheem], corrected the problems with the component parts of all its furnaces within a period of approximately three and one half years.

e. The claims of Plaintiff, [Phelps], herein are for economic damages.

f. There is a lack of direct privity between Plaintiff, [Phelps] and Defendant [Rheem], with regard to any sale which is the subject of this action.

2. There are genuine issues as to material facts regarding whether the Defendant [Federated] acted as an agent of Defendant [Rheem], with regard to any sale which is the subject of this action.

3. These figures are both "net" of the $13,715 credit total.

4. At the time of the filing of the motion for summary judgment, counsel for Rheem also represented Federated, at Federated's demand. Federated afterward reasserted its indemnity claim against Rheem in November, 1997. Federated is not a party to this appeal.

3. There are genuine issues as to material facts regarding whether the exclusive remedy of replacement of defective parts failed of its essential purpose.

4. There are genuine issues as to material facts regarding whether implied warranties may have arisen from course of dealing or usage of trade.

5. No recovery may be had in a negligence claim based upon the failure of a product to perform as expected, where the Plaintiff suffers only economic damages.

6. Defendant, [Rheem], is entitled to judgment as a matter of law with regard to the negligence claims of Plaintiff [Phelps].

IT IS, THEREFORE, ORDERED BY THE COURT AS FOLLOWS:

1. Upon any trial or any further hearing in this action, those matters set forth in paragraphs 1(a), 1(b), 1(c), 1(d), 1(e) and 1(f) hereof shall be deemed established, and any such trial or hearing shall be conducted accordingly.

2. The motion for Summary Judgment filed by Defendant, Rheem Manufacturing Company, be and the same is hereby DENIED with regard to the claims of Plaintiff [Phelps], for breach of express warranty and consequential damages.

3. The Motion for Summary Judgment be and the same is hereby DENIED with regard to the implied warranty claims of Plaintiff [Phelps].

4. The Motion for Summary Judgment filed by Defendant [Rheem], be and the same is hereby GRANTED with regard to the negligence claims of Plaintiff [Phelps].

Rheem filed a motion to certify the trial court's order on June 29, 1998; that motion was granted on June 30, 1998. The trial court's order certifying the ruling for interlocutory appeal read, in pertinent part, as follows:

6. The Court's Order of June 15, 1998 involved substantial questions of law, the early determination of which will promote a more orderly disposition of this action, including:

Whether the failure of essential purpose of a limited warranty remedy under [IND.CODE § 26–1–] 2–719(2) is independent from [IND.CODE § 26–1–] 2–719(3) which reads consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable and whether, because the test[s] for the two subsections are different, a limited remedy of repair or replacement survives under subsection (2) unless it fails of its essential purpose, but a limitation of consequential damages survives under subsection (3) unless it is unconscionable.

Whether an intermediate reseller of goods can avail itself of the doctrine of failure of essential purpose under 2–719(2) where the intermediate reseller has sold and therefore no longer owns the goods, and where the intermediate reseller has created additional express warranties with remedies of greater scope than that of the defendant manufacturer.

## Discussion and Decision
### *Standard of Review*

When reviewing the propriety of a ruling on a motion for summary judgment, this court applies the same standard applicable to the trial court. *Rogers v. Grunden,* 589 N.E.2d 248, 252 (Ind.Ct.App.1992), *trans. denied.* We must consider the pleading and evidence sanctioned by Ind. Trial Rule 56(C) without deciding its weight or credibility. *Id.* All evidence must be construed in favor of the nonmoving party. *Id.* Only if such evidence shows that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law should summary judgment be granted. *Id.*

### I. *Failure of Essential Purpose*

The primary issue before this Court is the determination of the relationship between subsection (2) and subsection (3). Subsection (2) provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as

provided in [IND.CODE § ] 26–1." Subsection (3) provides that

> [c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable, but limitation of damages where the loss is commercial is not.

Both parties also rely upon different sections of Comment 1 to IND.CODE § 26–1–2–719. Comment 1 reads as follows:

> 1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.
>
> However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

■ It is important to note at the outset that the trial court was absolutely correct in holding, "There are genuine issues as to material facts regarding whether the exclusive remedy of replacement of defective parts failed of its essential purpose." We cannot decide as a matter of law whether Rheem's limited remedy has failed of its essential

purpose: "Whether an exclusive or limited remedy has failed of its essential purpose is a question of fact and consideration must be given to the facts of the case which has actually arisen as distinguished from conjecture in a hypothetical case which might arise." 67A AmJur.2d § 922 at 325–26; *see also Johnson v. John Deere Co.,* 306 N.W.2d 231, 238 (S.D.1981). Phelps argues that the limited remedy has failed of its essential purpose; Rheem's argument seems to be that the failure of essential purpose *vel non* is irrelevant.[5] In order for this Court to reach the core question of this interlocutory appeal, however, we must assume, *arguendo,* that the limited remedy has failed of its essential purpose. This is because Phelps argues that since Rheem's limited remedy failed of its essential purpose, the consequential damages exclusion is no longer operative under subsection (2), which provides that in such an instance, "remedy may be had as provided in [IND.CODE § ] 26–1."

Professors James J. White and Robert S. Summers, in their treatise on the Uniform Commercial Code, explain that "[t]here is now a deep division among the courts on the question whether consequential damages ... are recoverable when a limited warranty has failed of its essential purpose and a separate contractual provision excludes liability for consequential economic loss." WHITE & SUMMERS, UNIFORM COMMERCIAL CODE (3d Ed.1988) § 12–10 at 604. The parties before this Court are on either side of this "deep division," and no Indiana court has ruled on the issue.

The "independent" view favored by the majority of jurisdictions (and Rheem) is summarized in the following language submitted and relied upon by Rheem:

> The courts relying on subsection (3) view it as 'independent' from subsection (2). Accordingly, these 'independent' courts 'see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, without more, invali-

---

5. "This point of law is not in debate, and its repeated assertion begs the question before the Court. The issue before the Court is whether a consequential damages exclusion is enforceable unless unconscionable or, put another way, will the failure of essential purpose of a limited reme-

dy, without more, invalidate a consequential damages exclusion. That question is not answered by ... repeated recitation that the failure of essential purpose of a limited remedy is a question of fact." (Appellant's Reply Br. at 11.)

dates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.' . . . That the two subsections are independent is supported by the Code which tests each by a different standard: a limited remedy of repair-or-replace survives under subsection (2) unless it fails of its essential purpose; a limitation of consequential damages survives under subsection (3) unless it is unconscionable. Because the tests for the two subsections are different, the 'independent' courts conclude the two subsections are wholly distinct.

*Middletown Concrete Products v. Black Clawson Co.*, 802 F.Supp. 1135, 1152 (D.Del. 1992), internally citing *Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir.1980) (interpreting New Jersey Law). The *Middletown Concrete* court also noted that there is support for this view in Comment 1: "Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." *Id.*, citing Iowa Code Ann. § 554.2719 cmt. 1 (identical to IND.CODE § 26–1–2–719 cmt. 1). The independent courts reason that an exclusion is "valid unless unconscionable." *Smith v. Navistar Int'l Transp. Corp.*, 957 F.2d 1439, 1443 (7th Cir.1992). Comment 3 to IND.CODE § 26–1–2–719, set forth below, would also seem to support Rheem's argument:

> Subsection (3) recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable manner. Actually such terms are merely an allocation of unknown or undeterminable risks. The seller in all cases is free to disclaim warranties in the manner provided in Section 2–316.

The contrary view espoused by Phelps has been called the "dependent" or "interdependent" view, meaning that the evaluation of the validity of consequential damage exclusion clauses is necessarily dependent upon the availability of a limited remedy clause in the same agreement.[6] Cases representative of this approach include *Adams v. J.I. Case Company*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *R.W. Murray Co. v. Shatterproof Glass Corp.*, 758 F.2d 266 (8th Cir.1985); *Matco Machine and Tool Co. v. Cincinnati Milacron Co.*, 727 F.2d 777 (8th Cir.1984); *Soo Line Railroad Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir.1977); and *Jones and McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39 (N.D.Ill.1970). "The 'dependent' courts follow a two-step analysis. First, they evaluate the limited remedy under subsection (2) to determine if the clause has failed of its essential purpose. If the limited remedy has failed, the consequential damage exclusion is automatically void." (Appellee's Br. at 14.)

Each side naturally argues that its position is "more thoroughly reasoned and consistent with the general purposes of the Uniform Commercial Code." *Middletown Concrete*, 802 F.Supp. at 1152. Phelps asserts that the dependent approach "reflects the true intent of the parties more closely than the 'independent' courts as no buyer would purchase goods knowing that if the limited remedy provided failed, the buyer would be precluded from [obtaining] consequential damages." (Appellee's Br. at 14). However, the *Middletown Concrete* court (and those like-minded, including Rheem), agree with White and Summers that the "independent cases"

> seem most true to the Code's general notion that the parties should be free to contract as they please. When the state intervenes to allocate the risk of consequential loss, we think it more likely that the loss will fall on the party who cannot avoid it at the lowest cost. . . . Believing the parties to know their own interests best, we would leave the risk allocation to the parties.

WHITE & SUMMERS § 12–10 at 605. In making this observation, the authors were referring to *American Electric Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 19 UCC 1009 (S.D.N.Y.1976) as "a leading case" for the independent view, and its progeny. The limitation at issue in *American Electric*

---

6. Phelps' view is also sometimes called the "straightforward" or "plain language" view, referring to the plain language of subsection (2).

*Power* was a repair-or-replace provision covering a $12 million generator. The court declined to "disturb the consensual allocation of business risk" memorialized in the agreement. 418 F.Supp. at 458. However, the *American Electric Power* court also stated that "it must be emphasized that the contract here in issue is not of the type entered into by the average consumer, but a commercial agreement painstakingly negotiated between industrial giants." *Id.* Phelps points out that *American Electric Power* is factually distinguishable from the instant case, in that "the limited warranty and consequential damage exclusion were printed on cards and placed in the cartons in which the furnaces were delivered. There were no negotiations here." (Appellee's Br. at 17.)

The Seventh Circuit held in *AES Technology Systems, Inc. v. Coherent Radiation* that "we reject the contention that failure of the essential purpose of the limited remedy automatically means that a damage award will include consequential damages." 583 F.2d 933, 941 (7th Cir.1978). The *AES* court, however, did not place great importance on the question of whether the limited warranty at issue in that case represented a meeting of the minds. "There is no evidence that the warranty was the subject of negotiation. However, the warranty was at least included on the reverse side of [the defendant-seller's] bid form, on the reverse side of [the defendant-seller's] invoice form, and on a separate warranty card packed with the [l]aser." 583 F.2d at 938. The *AES* court discussed the purpose of § 2–719 as described by the Official Comment, and then went on to state, "By limiting the warranties available and the remedies under the warranties, parties are able to provide a consensual allocation of risk in accordance with sound business practices." *Id.* Phelps asserts that AES represents a "hybrid view" instituted by the Seventh Cir-

cuit and followed by the Northern District of Illinois in *KKO, Inc. v. Honeywell, Inc.*, 517 F.Supp. 892 (N.D.Ill.1981).[7] It is true that the *AES* court held that "an analysis to determine whether consequential damages are warranted must carefully examine the individual factual situation, including the type of goods involved, the parties and the precise nature and purpose of the contract." 583 F.2d at 941. However, Rheem refutes the characterization of the *AES* decision as a "hybrid view," and asserts that the more recent *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F.Supp. 1358 (N.D.Ill. 1996) (applying Illinois law) correctly recognized that in *AES* and subsequent holdings, the Seventh Circuit rejected outright the Eighth Circuit opinions relied upon by Phelps.

The *Lefebvre* court also discussed *Chatlos Systems v. Nat'l Cash Register Corp.*, 635 F.2d 1081 (3d Cir.1980), an opinion often cited by "independent" courts, including the Seventh Circuit in *Smith v. Navistar Int'l Transp. Corp.*, 957 F.2d 1439, 1443 (7th Cir. 1992). In *Chatlos*, the Third Circuit stated:

> The limited remedy of repair and a consequential damages exclusion are *two discrete ways of attempting to limit recovery for breach of warranty.* The [U.C.C.], moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable. We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, *without more*, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.

(The foregoing language is found in *Lefebvre*, 946 F.Supp. at 1371; *Smith*, 957 F.2d at

---

7. Phelps also relies upon *KKO* because, it asserts, it is "very factually similar to the case at hand in that Honeywell sold electrical equipment to KKO that was then resold by KKO." The *KKO* court discussed *AES* and *V–M Corp. v. Bernard Distributing Co.*, 447 F.2d 864 (discussed *infra* ), as well as another case relied upon by Phelps, *Adams v. J.I. Case Company*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970). For Phelps, the relevance of *KKO* is that the Illinois appellate court affirmed

the denial of a summary judgment request to preclude consequential damages. According to Phelps, *KKO* stands for the proposition that "both [*AES* and *V–M Corp.*] leave open the prospect that factual circumstances may permit an award of consequential damages where a limited remedy has failed of its essential purpose, notwithstanding a consequential damage exclusion clause." (Appellee's Br. at 19.)

1443–44; and originated in *Chatlos*, 635 F.2d at 1086.) (Emphasis added.)

One of the Eighth Circuit cases relied upon by Phelps is *R.W. Murray v. Shatterproof Glass Corp.*, 758 F.2d 266 (8th Cir. 1985). The *R.W. Murray* court held that the plaintiffs had been able to "establish[ ] that Shatterproof's limited and exclusive warranty failed of its essential purpose under Missouri law," and therefore "all other contractual remedies" were available. 758 F.2d at 272. Although the defendant Shatterproof argued that the limitation of liability should be held valid unless unconscionable, the Eighth Circuit deferred to the district court's interpretation of Missouri state law, finding the court's interpretation "both reasonable and permissible." *Id.* In so holding, the appellate court acknowledged that other courts (e.g., *Chatlos, supra*) had held the other way, but that according to WHITE & SUMMERS § 12–10, both the Missouri version of the U.C.C. and Comment 1 supported its holding.

Finally, Phelps relies upon *Adams v. J.I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970). *Adams* is an older case that involved a defective tractor. The buyer of the tractor sued the dealer and the manufacturer when the tractor was not properly repaired until approximately one year and three months after the problems were reported to the defendants. The plaintiff claimed that while the tractor was being repaired, he suffered the loss of profits, jobs, and reputation because of his inability to perform jobs he had contracted to do. The *Adams* language cited by Phelps is as follows:

> Plaintiff could not have made his bargain and purchase with knowledge that defendants would be unreasonable, or, in the words of his complaint, wilfully dilatory or careless and negligent in making good their warranty in the event of its breach. The manufacturer and the dealer have agreed in their warranty to repair or replace defective parts while also limiting their liability to that extent. Had they reasonably complied with their agreement contained in the warranty they would be in a position to claim the benefits of their stated limited liability and to restrict plaintiff to his stated remedy. The limitations

of remedy and liability are not separable from the obligations of the warranty. Repudiation of the obligations of the warranty destroys its benefits. The complaint alleges facts that would constitute a repudiation by the defendants of their obligations under the warranty, that repudiation consisting of their failure or their careless and negligent compliance. It should be obvious that they cannot at once repudiate their obligation under the warranty and assert its provision beneficial to them.

261 N.E.2d at 7.

It is important to note that although Indiana has not expressly decided whether § 2–719(2) and § 2–719(3) are "independent" or "interdependent," Rheem asserts that our supreme court's decision in *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078 (Ind.1993), *reh'g denied*, "strongly suggests that the Indiana Supreme Court would follow the Seventh Circuit and the majority 'independent' view." (Appellant's Br. at 25).

*Rispens* involved the sale of watermelon seeds by a retailer and a grower to a farming corporation. When the watermelon crop failed because of "fruit blotch," the farming corporation brought an action against the retailer for breach of warranty, negligence, and strict liability. The retailer and grower had attempted to limit the amount recoverable under the warranties that accompanied the sale of the seeds.

*Rispens* is instructive for many reasons. First, although neither party before us relies on *Rispens* for this proposition, the Indiana Supreme Court did reiterate in *Rispens* that "[l]imitations of remedy are not favored in Indiana and are strictly construed against the seller on the basis of public policy." 621 N.E.2d at 1085, citing *Hahn v. Ford Motor Co.*, 434 N.E.2d 943, 952–3 (Ind.Ct.App.1982).

Second, regarding the concept of failure of essential purpose, the *Rispens* court cited the following excerpts from WHITE & SUMMERS with approval:

> Commentators have suggested that § 2–719, as it relates to failure of essential purpose, is not concerned with arrangements which were oppressive at the in-

ception which is a question of unconscionability, but with the application of an agreement to "novel circumstances not contemplated by the parties." WHITE & SUMMERS, § 12–10. In addition, they have suggested that this provision should be triggered when the remedy fails of *its* essential purpose, not the essential purpose of the U.C.C., contract law, or of equity.

621 N.E.2d at 1085 (emphasis in the original). Interestingly, Phelps points to this same excerpt in *Rispens* and asserts that it is "a clear indication that the Indiana Supreme Court would follow the 'dependent' courts." (Appellee's Br. at 25).

The diametrically opposed conclusions drawn by the parties in response to this excerpt are, it seems, rooted in each side's fundamental understanding of whether the heating units' failures were a possibility clearly foreseen (or foreseeable) by both parties or "novel circumstances not contemplated by the parties." Obviously, the answer lies in whether there was a "meeting of the minds" at the agreement's inception. The *Rispens* court notably *did* hold that "whether there was mutual assent to the limitation of liability is a question of fact precluding summary judgment." 621 N.E.2d at 1088. Rheem, in its brief, points to. the additional discussion of substantive unconscionability found in the same section of *Rispens* and the court's conclusion that "[t]he possibility that a latent defect may exist is a risk that is present at the time [a] contract is formed. It is not unconscionable for the seed producer and distributor to redistribute such risk." 621 N.E.2d at 1087. Phelps, on the other hand, cites the introductory language found at 621 N.E.2d at 1085: "We hold that, although such limitations are enforceable generally, there remains a question of fact as to their applicability here." It would seem that perhaps Phelps has confused the supreme court's statement that "there remains a question of fact as to [the limitation's] applicability" with a blanket holding that if there is a failure of essential purpose, "a purchaser would be entitled to recover an amount in excess of the cost of repairs." (Appellee's Br. at 24).

*Rispens* does seem, however, to indicate that our supreme court would be concerned with whether sufficient evidence existed at the trial court level to enable the fact-finder to determine whether there was a meeting of the minds as to the warranty provisions in a commercial sales agreement.

Finally, the *Rispens* court went on to state:

Th[e] provision clearly states that liability is limited to the purchase price of the seed, and does not allow any amount for incidental or consequential damages such as Hall Farms' lost profits. Obviously, the purpose of the limitation was to limit contract liability to the purchase price of the seed. **The contract term has not failed of its essential purpose;** rather, enforcement of the limitation will serve precisely the purpose intended.

621 N.E.2d at 1086 (emphasis added).

We are convinced that the so-called "majority," or "independent" view of subsections (2) and (3) is more in keeping with Indiana jurisprudence and the purposes of the U.C.C. We agree that in testing each type of provision by a different standard—a limited remedy by failure of essential purpose, and an exclusion by unconscionability—the subsections were intended to be read independently of one another. We now adopt this independent view and agree with the Third Circuit that it is does not follow that "the failure of ·the limited remedy provided in the contract, *without more,* invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive." *Chatlos,* 635 F.2d at 1086 (emphasis added).

■ However, the adoption of the independent view is not, itself, dispositive of the ultimate issue before us—i.e., whether the trial court erred in denying in part Rheem's motion for summary judgment. Rather than focusing solely upon where this decision will place Indiana within the broad spectrum of U.C.C. decisions across the jurisdictions, we must also concern ourselves with the fairness of the outcome in this case. While we decline to hold that Rheem's limited remedy and exclusions were born of unconscionabili-

ty, or even that their limited remedy failed of its essential purpose, the circumstances *of this case* do give rise to a genuine issue of material fact: whether the cumulative effect of Rheem's actions was commercially *reasonable*. This issue, to us, goes to the heart of the "without more" referenced by the *Chatlos* court. We remain mindful that even as Comment 1 to IND.CODE § 26–1–2–719 advises that "reasonable agreements limiting or modifying remedies are to be given effect," the next sentence also cautions that "it is of the very essence of a sales contract that at least minimum adequate remedies be available." We must turn to other provisions of Indiana's version of the U.C.C. to reach an equitable result in this case.

## II. Breach of Warranty

■ The trial court certified as a question for purposes of this appeal whether, regardless of the construction and interpretation of subsection(2) and subsection (3), Phelps is entitled to a trial on the issue of consequential and incidental damages arising from a putative breach of warranty by Rheem:

> Whether an intermediate reseller of goods can avail itself of the doctrine of failure of essential purpose under 2–719(2) where the intermediate reseller has sold and therefore no longer owns the goods, and where the intermediate reseller has created additional express warranties with remedies of greater scope than that of the defendant manufacturer.

Phelps' original action was based upon theories of negligence, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. It is not at issue that the trial court correctly granted summary judgment on the negligence claim, and we have held that "failure of essential purpose" is not dispositive. The remaining issues, as described in the certification above and in the parties' briefs, are intertwined and complicated, and require us to turn our attention to different sections of the U.C.C.

IND.CODE § 26–1–2–714 governs a buyer's damages for breach in regard to accepted goods and provides:

> (1) Where the buyer has accepted goods and given notification ... he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

> (3) In a proper case any incidental and consequential damages under [IND.CODE § ] 26–1–2–715 may also be recovered.

IND.CODE § 26–1–2–715 describes incidental and consequential damages:

> (1) Incidental damages resulting from seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

> (2) Consequential damages resulting from the seller's breach include

> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not be reasonably be prevented by cover or otherwise; and

> (b) injury to person or property proximately resulting from any breach of warranty.

We acknowledge first that Phelps is a "vertical non-privity plaintiff" [8] *vis-à-vis* Rheem because it purchased all the defective

---

8. "A vertical relationship describes one that exists between parties in a distributive chain, i.e., between a manufacturer, wholesaler, retailer, and ultimate buyer. A buyer within this chain that did not buy goods directly from the named defendant would be a 'vertical non-privity plaintiff' as to that defendant." *Spring Motors Distributors v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660, 675 (1985).

furnaces through the intermediary Federated. Accordingly, to circumvent the procedural problems posed by this "non-privity plaintiff" status, Phelps has advanced the argument that Federated acted as an agent of Rheem, a claim for which the trial court denied summary judgment in Rheem's favor.

Although "the version of the U.C.C. enacted by the Indiana General Assembly does not answer the question of whether privity is required to permit recovery under an implied warranty from a remote seller, or, as in this case, the manufacturer," Indiana jurisprudence has generally required such so-called "vertical" privity. *Candlelight Homes, Inc. v. Zornes*, 414 N.E.2d 980, 981 (Ind.Ct.App. 1981). This is in keeping with the majority of jurisdictions, although it is notable that Professors White and Summers observed in 1988 that "a growing number of courts now allow non-privity plaintiffs to recover for direct (and even consequential) economic loss." WHITE & SUMMERS, § 11–5 at 537.[9]

In *Spring Motors Distributors v. Ford*, 98 N.J. 555, 489 A.2d 660, 663 (1985), the New Jersey Supreme Court held that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods could recover from an immediate seller *and* a remote supplier in a distributive chain for breach of warranty under the U.C.C. Plaintiff Spring Motors Distributors was in the business of selling and leasing trucks and had purchased from Ford fourteen trucks specifically equipped with certain specially requested transmissions. Ford issued with each truck a warranty worded very similarly to the warranty in the instant case. The transmission manufacturer had also issued a warranty with each transmission to Ford. The gravamen of Spring Motors' complaint was that defects in the transmissions caused Spring Motors to sustain a loss in the benefit of its bargain and consequential damages.

*Spring Motors* contains a thorough and well reasoned discussion of the New Jersey equivalent of our IND.CODE § 26–1–2–318, which reads,

A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

Comment 2 to this section explains in part that "[t]he purpose of this section is to give certain beneficiaries the benefit of the same warranty which the buyer received in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.'" Comment 3 provides that the section

expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section in this form is neutral and *is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain.* (Emphasis added.)

As the *Spring Motors* decision explains, the foregoing language indicates that "the Code drafters have left it to the courts to determine whether vertical privity should be required in a warranty action between a seller and a remote buyer." 489 A.2d at 676.

The New Jersey Supreme Court considered "the policies underlying . . . the U.C.C.[.] Those policy considerations include, among others, the relative bargaining power of the parties and the allocation of the loss to the better risk-bearer in a modern marketing system." 489 A.2d at 670. The court recited the oft-cited language that "as between commercial parties, . . . the allocation of risks in accordance with their agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement." 489 A.2d at 671. However, "notwithstanding our recognition that the Code generally applies to parties in privity," the court held that "the absence of

---

9. *See, e.g., Moscatiello v. Pittsburgh Contractors Equipment Co.*, 407 Pa.Super. 363, 595 A.2d 1190 (1991), *appeal denied*, 529 Pa. 650, 602 A.2d 860 (1992) (liability of manufacturer for breach of implied warranty of merchantability upheld on theory that seller was a mere conduit for deal between ultimate buyer and manufacturer).

privity between a remote supplier and an ultimate purchaser should not preclude the extension to the purchaser of the supplier's warranties made to the manufacturer." 489 A.2d at 674. The court termed its decision

> particularly important in the present action[,] where Spring Motors read advertisements published by [the transmission builder], specifically requested [those] transmissions, expected the transmissions to be incorporated into trucks to be manufactured by Ford, contracted with Ford only, and now seeks to recover its economic loss. Given the nature of the transaction and the expectations of the parties, the absence of a direct contractual relationship should not preclude Spring Motors from asserting a cause of action for breach of express warranty against [the transmission builder].

489 A.2d at 676–677.

The *Spring Motors* court went on to analogize its previous holding in *Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675 (1984), wherein it had recognized an implied covenant that ran from a building contractor to a subsequent homeowner:

> In suits relating to home improvements, *Aronsohn* focuses attention on the original contract to determine the scope of the duty owed by the building contractor. In the present case, involving a commercial setting for the sale of goods, we likewise focus on the parties' expectations and contractual arrangements to determine a remote buyer's right to recover for economic loss.... Thus, our decision in *Aronsohn* creating an implied assignment of contract rights to a subsequent purchaser comports with the present decision to abolish vertical privity and to allow an ultimate purchaser to sue a remote manufacturer under the Code.

489 A.2d at 677.

 Just as the New Jersey Supreme Court, this Court has already carved out exceptions to the privity requirement. Agen-

cy between manufacturer and first seller is one such exception, as will be discussed briefly below.

The *Candlelight Homes* court noted that this Court has "permitted the plaintiff to recover on an implied warranty where it was shown that the contractual arrangements between the manufacturer and the dealer created an agency relationship, and where it was further shown that the manufacturer's agents participated significantly in the sale by means of advertising and personal contact with the buyer. Under those circumstances the court held that the manufacturer became a seller within the expectations of IND.CODE § 26–1–2–314." 414 N.E.2d at 981, citing *Thompson Farms, Inc. v. Corno Feed Products*, 173 Ind.App. 682, 366 N.E.2d 3 (1977).

 Rheem challenges the trial court's finding that there were issues of material fact that Federated was an agent of Rheem. At oral argument and in its brief to this Court, Phelps' argument on this issue is not its strongest. Generally, the question of whether an agency relationship exists is a question of fact. *Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind.Ct.App.1997), *aff'd* 688 N.E.2d 1250 (Ind.1997).[10] To establish an agency relationship, three elements must be shown: (1) a manifestation of consent by the principal to the agent; (2) an acceptance of the authority by the agent; and (3) control exerted by the principal over the agent. *Id.*

Virtually the only evidence Phelps has presented in support of its argument that Federated was an agent of Rheem is that Federated "oversaw the furnace update program via the dissemination of information via Technical Bulletins, as well as receiving claims from contractors under the update program," and that "Federated also held 'classes' on behalf of Rheem and educated contractors about new Rheem furnaces and other equipment. These classes would be 'taught' by a Federated representative and take place at Federated or the representative would visit Phelps directly."[11]

---

**10.** Inexplicably, our supreme court's grant of transfer in this matter is also reported in a table at 690 N.E.2d 1189.

**11.** Other than this excerpt, the majority of the material Phelps designated to the trial court in opposition to Rheem's summary judgment motion on this issue—i.e., the majority of the affida-

Phelps correctly asserts that this Court has held that the mere express denial of the existence of an agency relationship—such as the express denial in the distribution agreement between Rheem and Federated—is not in itself determinative of the matter. *Dutton v. International Harvester Company,* 504 N.E.2d 313, 317, n. 2 (Ind.Ct.App.1987), *trans. denied.* However, Phelps attempts to distinguish this case from *Dutton,* in that there is purportedly "more evidence" in this case than in *Dutton,* where "whether an agency relationship exists turn[ed] on the interpretation of the agreement." 504 N.E.2d at 316.

Although the existence of agency is generally a question of fact, Phelps asserts that this Court "sits in as good a position as the trial court to apply the law to the facts." Rheem, on the other hand, accurately argues that in *Candlelight Homes,* this Court held that a mere manufacturer/dealer relationship is not sufficient to abolish the privity requirement. 414 N.E.2d at 982.

Rheem also argues that it should not be required to indemnify Phelps against damages incurred as a result of warranties Phelps issued to its customers that Rheem did not issue to Phelps. Rheem explains, "Although Rheem's limited warranties exclude service labor, Phelps Heating gave one-year service labor warranties to its customers for repairs on all new installations of gas furnaces in the 1991 to 1994 time frame"; "[a]dditionally, Phelps Heating provided a 30–day labor warranty on service repairs . . ."; "Phelps Heating was also in the business of selling extended warranties to its customers in approximately 1991 to 1992." Rheem argues that "to the extent that additional labor allowances were granted for components exhibiting a higher than desire[d] failure rate, these labor allowances supplemented Rheem's limited remedy of Rheem's basic warranty." Finally, Rheem argues that Phelps extended greater warranties to the customers—or "end-users"—than those Rheem had extended to Phelps, and that to honor those greater warranties would "inferentially overrule Indiana indemnity law." In response, Phelps basically relies on

the same cases regarding the failure of essential purpose doctrine in its attempt to recover service labor costs. "The only fact that Phelps needs to prove is that it purchased the Rheem equipment, there was a breach of the Rheem warranty, and Phelps was damaged as a result. If Rheem asserts the breach of warranty was not the proximate cause of the damages, then this is an issue that Rheem can argue at trial."

We find that although the evidence supporting a genuine issue of material fact is slight regarding Phelps' argument that Federated acted as an agent of Rheem, when it is taken in conjunction with our decision that perfect vertical privity is not necessary in this case, as well as with the considerations of fairness we have articulated, a genuine issue of material fact exists as to (1) whether Rheem breached its express warranty or an implied warranty of fitness for a particular purpose; and (2) whether, once a breach occurred, Rheem's conduct in asserting its limited remedy was reasonable.

### *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed, and this cause is remanded to the trial court for further proceedings consistent with this opinion.

BAKER and RUCKER, JJ., concur.

vit of Michael Phelps—was subsequently ordered

stricken by the trial court.